UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VALERIE WILSON, et al.,

                              Plaintiffs,

         v.

WILDER BALTER PARTNERS, INC., et al.

                              Defendants.

No. 13-CV-2595 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Valerie Wilson
White Plains, NY
*Pro Se Plaintiff*

Ettawanda Wilson
White Plains, NY
*Pro Se Plaintiff*

Joshua E. Kimerling, Esq.
Cuddy & Feder, LLP
New York, NY
*Counsel for Defendants*

Thomas Aquinas Cunnane, Esq.
Cuddy & Feder, LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiffs Valerie Wilson and Ettawanda Wilson (collectively "Plaintiffs") filed the

instant Complaint against Wilder Balter Partners, Inc. ("Wilder Balter Partners"), Angela

Grullon ("Grullon"), Catherine Peagler ("Peagler"), and Juan Gonzalez ("Juan Gonzalez")

(collectively "Defendants"), alleging that Defendants engaged in discriminatory practices in

violation of the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of

1988, 42 U.S.C. § 3601, *et seq.* (the "FHA"), Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794 (the "Rehabilitation Act"), Title II of the Americans with Disabilities Act of 1990,

42 U.S.C. § 12132 (the "ADA"), and Article 15 of the New York State Human Rights Law, New

York Executive Law § 290, *et seq.* ("NYHRL").  (*See* Second Am. Compl. ("SAC") (Dkt. No.

26).)  Before the Court is Defendants' Motion To Dismiss the Second Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Mot. To Dismiss ("Mot.") (Dkt. No.

30).)  For the following reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiffs' Second Amended Complaint and are taken

as true for the purposes of resolving the instant Motion.  Plaintiffs are African-American

residents in a one-bedroom apartment at Battle Hill House Apartments ("Battle Hill") in White

Plains, New York.  (*See* SAC at 1, ¶¶ 2, 20.)  Valerie Wilson is Ettawanda Wilson's daughter

and live-in aide.  (*Id.*)  Plaintiffs allege that even though Ettawanda Wilson's "name was the *next*

*and only* [name] on [the] waiting list for a two[-]bedroom" apartment at Battle Hill, Defendants

denied her the two[-]bedroom apartment that she wanted—Unit 405—by discriminating against

her or Valerie Wilson on the basis of their race and/or Ettawanda Wilson's disability.  (*Id.*

¶¶ 1–3, 5.)

Plaintiffs "inform[ed] the management office in writing of [their] need for a

two[-]bedroom [apartment]," on January 26, 2013, and Grullon, the property manager, advised

Valerie Wilson that she was waiting for the approval of Peagler, the regional property manager.

(*Id.* at ¶¶ 7, 15; SAC Ex. 1, at unnumbered 1.)  In the meantime, Grullon "continued showing

[Unit 405] . . . to prospective tenants, including [Grullon's] own father."  (SAC ¶ 8.)  Moreover,

Juan Gonzalez "beg[a]n frequenting the [Unit,] presumably to prepare the apartment for the next tenants." (*Id.* ¶ 9.)  Valerie Wilson informed Grullon that she "tried to communicate with . . . Peagler, but when [she] asked for her business card in [the] hope[] [that she] could reach out to [Peagler] by email, [Peagler] was extremely brash and responded, '[n]o!'" (*Id.* ¶ 12.) Grullon informed Valerie Wilson that Peagler "said that [Ettawanda Wilson] is not getting that apartment," (*id.* ¶ 13), and Peagler asked Grullon to "call another woman to try to lease the apartment to her," (*id.* ¶ 14).  Plaintiffs allege that Grullon and Peagler "both demonstrated their clear intent of [ensuring] [Ettawanda] Wilson was not even being considered" for the two-bedroom apartment.  (*Id.* ¶ 15 (internal quotation marks omitted).)  Grullon also informed Valerie Wilson that neither the "inquiry list" nor the "waiting list" existed.  (*Id.* ¶ 19.)

At Valerie Wilson's request, and notwithstanding Grullon's apparent intent not to offer the apartment to Ettawanda Wilson, Grullon accompanied Valerie Wilson to view Unit 405.  (*Id.* ¶ 22.)  Valerie Wilson informed Grullon that "[her] mother would like the unit . . . [and] . . . told her not to install carpet until [her] mother was allowed to see the apartment." (*Id.* ¶ 24.) Specifically, Valerie Wilson told Grullon that her mother would not want carpet because "bed[] bugs thrive in carpet." (*Id.* ¶ 27.)  Grullon responded that carpet had already been ordered, and "was mandatory." (*Id.* ¶¶ 24, 26.)  Plaintiffs claim that the "decision to install the carpet *clearly indicated* the decision had already been made to violate [Ettawanda] Wilson's Fair Housing Act rights," and that Plaintiffs were denied the "same rights as the current Caucasian family and the prior Asian family . . . in . . . apartment # 404 . . . [because] [b]oth [families] were allowed not to have carpet forced upon them prior to tenancy and both were never . . . forced to have carpet after they accepted [the] tenancy." (*Id.* ¶¶ 30–33 (second, third, and fourth emphasis omitted).)

Plaintiffs also allege that Grullon informed Valerie Wilson that a woman was "trying to bribe her way in[to] the building" and that the "woman was able to unlawfully lease [a one-bedroom unit, Unit 103] for herself and a senior woman who appear[ed] to be her disabled mother." (*Id.* ¶¶ 37, 41.) Plaintiffs claim that the former tenants in Unit 103 moved into Unit 405 "just so [Ettawanda] Wilson would not be able to rent [Unit 405]." (*Id.* ¶ 44.)

Next, Plaintiffs allege that "[m]anagement sent a person to serve a document to [Ettawanda] Wilson concerning her recertification and [the person] told her, 'The building can evict you for this.'" (*Id.* ¶ 45 (internal quotation marks omitted).) The person advised Ettawanda Wilson that she needed to complete her recertification requirements, and Ettawanda Wilson told "him she had done so already, and until this day states she ha[s] done it." (*Id.* ¶ 47 (internal parenthesis omitted).) Plaintiffs claim that Wilder Balter Partners "serve[d] a fictitious court document to scare, intimidate, and coerce [Ettawanda Wilson] into doing what they wanted her to do[,]" (*id.* ¶ 71), and the legal proceeding against Ettawanda Wilson "was completely fabricated," (*id.* ¶¶ 72–73), and without regard to "the physical consequence such a fabrication could have on a chronically disabled senior tenant," (*id.* ¶ 74). By letter dated July 8, 2012, Valerie Wilson sent a "response to the served document" to Wilder Balter Partners. (SAC ¶ 57; SAC Ex. 3, at unnumbered 1.)

The Second Amended Complaint also alleges that Defendants sent Plaintiffs letters that "represented more harassment," and point the Court to Exhibit 4. (SAC ¶ 60.) Exhibit 4, appended to the Complaint, includes one letter dated March 12, 2012 from property manager Mairim Gonzalez ("Gonzalez") informing Ettawanda Wilson that her "apartment is due to be painted," and requesting that Ettawanda Wilson indicate whether or not she would like her apartment painted by March 19, 2012. (SAC Ex. 4, at unnumbered 1.) The next letter in Exhibit

4 is dated March 27, 2012 from Gonzalez to Ettawanda Wilson stating that "[y]ou are receiving this notice again as your apartment is due to be painted and we have not heard from you." (*Id.* at unnumbered 2.) The third letter in Exhibit 4 is dated April 6, 2012 from Gonzalez to Ettawanda Wilson explaining that "as a result of you cancelling our scheduled unit inspection on April 3, 2012, your apartment is still due [for an inspection]," and requesting that Ettawanda Wilson "[p]lease arrange a new inspection date with management as soon as possible." (*Id.* at unnumbered 3.) In a letter dated April 23, 2012, also included in Exhibit 4, Gonzalez informed Ettawanda Wilson that:

> It has come to management's attention that you do not wish to be included in the 2012 painting cycle. Please be advised that due to the strict rules and regulations set forth by HUD, an inspection of your unit must be conducted to avoid any compliance issues. If your apartment is found to be in good condition, management will honor your wishes and not include you in the painting cycle. However, should your apartment need painting, you will automatically be added to the cycle list . . . . As a result of the upcoming cycle, your apartment must be available for inspection tomorrow, Tuesday, April 24, 2012. I apologize in advance for the short notice, however, the response time of many residents was severely delayed, thus affecting the overall schedule.

(*Id.* at unnumbered 4.) The last letter in Exhibit 4 is dated May 1, 2012 from the regional manager, Cristina Clark, to Ettawanda Wilson. (*Id.* at unnumbered 5.) The letter advises that "management is in receipt of your letter, dated April 24, 2012, alleging continued intimidation and discrimination against you on several pending items." (*Id.*) Clark explained that "[i]t [was] management's responsibility to execute re-certifications and projects in a timely fashion . . . . [and] [a]s a result of non compliance with the Section 8 regulations, [m]anagement has been forced to contact you in writing several times on various issues due to your lack of response." (*Id.*) The letter includes a timeline as to four pending items: (1) recertification; (2) 50059 form; (3) Painting cycle; and (4) Unit inspection. (*Id.*) Clark also states that "[i]n addition to the communications in writing, [m]anagement verbally relayed to you the need for

the pending recertification unit inspection and painting cycle unit inspections when you signed

your HUD 50059 form on April 17, 2012." (*Id.*)

Plaintiffs allege that Defendants harassed them by "demand[ing] . . . access to complete

[a] dual inspection immediately." (SAC ¶¶ 61–63.) Plaintiffs claim that "every single violation"

that prompted the dual inspection "ha[d] not been addresse[d] . . . demonstrating it was never

about the HUD inspection[,] [but, rather] . . . just abuse and harassment." (*Id.* ¶ 64 (emphasis

omitted).) Plaintiffs state that they had never been required to participate in an inspection before,

and that HUD inspections were not "done for everyone." (*Id.* ¶¶ 66–67.) Moreover, Plaintiffs

allege that "Management . . . had the . . . exterminator . . . knock[] on the door and once inside

he[] [would] first make small talk and [then] ask" if Valerie Wilson lived in the apartment. (*Id.*

¶ 68.) Valerie Wilson claims that her health was affected by the harassment, and Ettawanda

Wilson "decided that if Wilder Balter Partners . . . continu[ed] to treat her horribly . . . she did

not want the apartment." (*Id.* ¶¶ 77–79 (emphasis omitted).)

Valerie Wilson visited a HUD representative to discuss several issues, "including the bed

bug policy," and the "fact that management was made aware [that Plaintiffs] did not want a paint

job" for their current apartment. (*Id.* ¶¶ 48–52.) Valerie Wilson also showed the representative

from HUD the document that Ettawanda Wilson had received at her apartment, (*id.* ¶ 53), and

notified him that she lived with her mother as a live-in aide, (*id.* ¶ 56).

On February 1, 2013, Valerie Wilson sent an inquiry to Jason O'Neill ("O'Neill"), the

HUD project manager for Battle Hill, informing him that she was aware of her "rights available

via the courts," and that Peagler was ignoring Plaintiffs' "reasonable accommodation request" to

rent the two-bedroom apartment. (*Id.* ¶¶ 82, 84, 86.) O'Neill responded by email on February

21, 2013, explaining that the management at Battle Hill had informed him that they had

contacted Ettawanda Wilson and outlined the steps that she needed to take to have Valerie

Wilson added as an additional tenant to the lease, or as a live-in aid.  (*Id.* ¶ 92.)  The instant

Complaint references such a letter from Peagler dated February 5, 2013, and Plaintiffs attached

the letter to the Complaint.  (*Id.* ¶ 96.)  Valerie Wilson has not requested to be a tenant on her

mother's lease, (*id.* ¶¶ 97, 104), and she "do[es] not believe caretakers are required to be on the

lease nor required to recertify because income from a live[-]in aid is excluded from the

households [sic] income," (*id.* ¶ 98).  She alleges that she informed O'Neill that she was her

mother's caretaker in 2012, and that Peagler was aware that she lived with her mother.  (*Id.*

¶ 105.)  Valerie Wilson states that when she tried to contact Peagler, she "was denied."  (*Id.*)

   The Second Amended Complaint also discusses a claim that Plaintiffs filed against Battle

Hill in 2011.  Plaintiffs allege that in October 2011, "the management ke[pt] send[ing]

exterminators[] to inspect for bed [] bugs, but not exterminating though management was fully

aware [that Plaintiffs] had an infestation of bed bugs."  (*Id.* ¶ 110.)  Plaintiffs allege that after

Ettawanda Wilson did not answer the door to the apartment, Juan Gonzalez and an exterminator

unlocked the door and entered Ettawanda Wilson's bedroom.  (*Id.* ¶ 114.)  Juan Gonzalez

explained that he and the exterminator were in the apartment to inspect for bed bugs.  (*Id.* ¶ 116.)

Plaintiffs allege that the management at Battle Hill did not provide notice of the inspection.  (*Id.*

¶ 121.)  Valerie Wilson also claims that "[e]arly on, the local Wilder Balter Management denied

[her] a key for entry, until [her] mother was located incapacitated, and Juan [Gonzalez] was

forced to let [her] in to check on [her] mother."  (*Id.* ¶ 125.)  Finally, the Second Amended

Complaint asks several questions about whether tenants and Valerie Wilson are authorized to use

parking spaces at Battle Hill and whether Ettawanda Wilson can install a "professional grade

lock" on the apartment door.  (*Id.* ¶¶ 133–35.)

### B.  Procedural History

Plaintiffs filed the original Complaint on April 19, 2013.  (Dkt. No. 3.)  The Court granted Plaintiffs' request to proceed in forma pauperis on April 24, 2013.  (Dkt. No. 7.) Plaintiffs filed an Amended Complaint on December 4, 2013, (Dkt. No. 22), and a Second Amended Complaint on March 28, 2014, (Dkt. No. 26).  Pursuant to a scheduling order adopted at a pre-motion conference before the Court on May 19, 2014, (Dkt. No. 29), Defendants filed their Motion To Dismiss and supporting papers on June 10, 2014, (Dkt. Nos. 30–32).  At Plaintiffs' request, the Court granted Plaintiffs an extension to file their opposition to the Motion until August 18, 2014.  (Dkt. No. 35.)  On August 26, 2014, the Court granted Plaintiffs an additional thirty days to submit their opposition papers, and stated that "[t]here will be no more extensions."  (Dkt. No. 40.)  Plaintiffs did not submit papers in opposition to the Motion.

## II.  Discussion

### A.  Applicable Law

#### 1.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citations omitted).  Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

For the purposes of Defendants' Motion To Dismiss, the Court is required to consider as true the factual allegations contained in the Second Amended Complaint.  *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).  Moreover, the "failure to oppose [Defendants'] [M]otion [T]o [D]ismiss does not, by itself, require the dismissal of [Plaintiffs'] claims."  *Leach v. City of New York*, No. 12-CV-2141, 2013 WL 1683668, at *2 (S.D.N.Y. Apr. 17, 2013).  Rather, even though "a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading

and knowledge of the law." *McCall v. Pataki*, 232 F.3d 321, 322–23 (2d Cir. 2000).  Finally, the

court construes "the submissions of a *pro se* litigant . . . liberally" and interprets them "to raise

the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471,

474 (2d Cir. 2006) (internal quotation marks omitted).

### 2.  Federal Antidiscrimination Law

The purpose of the FHA is "to provide, within constitutional limitations, for fair housing

throughout the United States."  42 U.S.C. § 3601.  Enacted as Title VIII of the Civil Rights Act

of 1968, the FHA "originally barred discrimination in housing on the basis of race, color,

religion, or national origin, and Congress added gender as a protected class in 1974."  *Williams v.*

*N.Y.C. Hous. Auth.*, 879 F. Supp. 2d 328, 334 (E.D.N.Y. 2012) (quoting *Schwarz v. City of*

*Treasure Is.*, 544 F.3d 1201, 1212 (11th Cir. 2008)) (internal quotation marks omitted).  "The

Fair Housing Act makes it unlawful '[t]o refuse to . . . rent after the making of a bona fide offer,

or to refuse to negotiate for the . . . rental of, or otherwise make unavailable or deny, a dwelling

to any person because of race, color, religion, sex, familial status, or national origin.'"  *Mitchell*

*v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (first alteration in original) (quoting 42 U.S.C.

§ 3604(a)); *Williams*, 879 F. Supp. 2d at 334 (same).  The statute similarly provides that,

"property owners and their agents may not 'unlawfully discriminate against any person in the

terms, conditions, or privileges of . . . rental of a dwelling.'"  *Mitchell*, 350 F.3d at 47 (quoting

42 U.S.C. § 3604(b)).

"[T]he Fair Housing Amendments Act of 1988 . . . extended the Fair Housing Act's

principle of equal opportunity in housing to individuals with [disabilities] [by] making it

unlawful to 'discriminate against any person in the terms, conditions, or privileges of sale or

rental of a dwelling, or in the provision of services or facilities in connection with such dwelling,

because of a handicap of that person.'"  *Logan v. Matveevskii*, — F. Supp. 3d—, 2014 WL

5025953, at *15 (S.D.N.Y. Sept. 29, 2014) (alteration omitted) (quoting 42 U.S.C.

§ 3604(f)(2)(A) (internal quotation marks omitted)); *see also Williams*, 879 F. Supp. 2d at 334

(noting that "[i]n 1988, Congress amended the FHA to prohibit discrimination based on handicap

and familial status" (internal quotation marks omitted)).  As amended, then, the statute makes it

"unlawful . . . '[t]o discriminate in the . . . rental, or to otherwise make unavailable or deny, a

dwelling to any . . . renter because of a handicap of that . . . renter . . . or any person associated

with that . . . renter."  42 U.S.C. § 3604(f)(1); *see also Olsen v. Stark Homes, Inc.*, 759 F.3d 140,

152 (2d Cir. 2014) (same); *Logan*, 2014 WL 5025953, at *15 (same); *Freeland v. Sisao LLC*,

No. 07-CV-3741, 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008) (same).  Discrimination for

the purposes of this subsection includes "a refusal to make reasonable accommodations in rules,

policies, practices, or services, when such accommodations may be necessary to afford [an

individual with a disability] equal opportunity to use and enjoy a dwelling[.]"  42 U.S.C.

§ 3604(f)(3)(B); *see Williams*, 879 F. Supp. 2d at 335 (same).  Federally assisted public housing

authorities are governed by the discrimination provisions in the FHA.  *See* 42 U.S.C. § 3603;

*Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 336 (E.D.N.Y. 2012).

 Like the FHA, "'[t]he ADA and the Rehabilitation Act also prohibit all discrimination

based on disability by public entities' and both statutes 'require[] that covered entities make

reasonable accommodations in order to provide qualified individuals with an equal opportunity

to receive benefits from or to participate in programs run by such entities.'"  *Logan*, 2014 WL

5025953, at *15 (alterations in original) (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City

of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002), *superseded by statute on other grounds*, ADA

Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553)).  Specifically, Title II of the

ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132; *see also Disabled in Action v. Bd. of Election in City of N.Y.*, 752 F.3d 189, 196 (2d Cir. 2014) (same).  "A housing authority is a 'public entity' covered by Title II of the ADA."  *Sinisgallo*, 865 F. Supp. 2d at 337 (citing 42 U.S.C. § 12131(1)).  Section 504 of the Rehabilitation Act, in turn, "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against otherwise qualified individuals with a disability."  *Disabled in Action*, 752 F.3d at 196 (internal quotation marks omitted).

A plaintiff may show that a defendant has engaged in discrimination proscribed by the FHA and the ADA under "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003); *see also Candlehouse, Inc. v. Town of Vestal*, No. 11-CV-93, 2013 WL 1867114, at *6 (N.D.N.Y. May 3, 2013) (same); *Williams*, 879 F. Supp. 2d at 335 (FHA claim); *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 343 (S.D.N.Y. 2010) (ADA claim); *Kennedy v. Related Mgmt.*, No 08-CV-3969, 2009 WL 2222530, at *4 (S.D.N.Y. July 23, 2009) (FHA claim).  The Court construes Plaintiffs' Second Amended Complaint to allege discrimination under theories of disparate treatment and a failure to make a reasonable accommodation, as discussed below.[1]

"Claims of housing discrimination are evaluated under the familiar burden-shifting

---

[1] There are no plausible allegations or inferences that the Court may draw from the allegations in the Second Amended Complaint that would support a disparate impact claim, as Plaintiffs point to no "outwardly neutral practices" that have "a significantly adverse or disproportionate impact on persons of a particular type produced by [Defendants'] facially neutral acts or practices."  *Tsombanidis*, 352 F. 3d at 575 (emphasis and internal quotation marks omitted).

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 617 (S.D.N.Y. 2011).  Under this framework, "Plaintiffs must first establish a prima facie case" of discrimination, and then "'the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision.'"  *Id.* (quoting *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)).  "'If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action.'"  *Id.* (quoting *Mitchell*, 350 F.3d at 47).  To establish a prima facie case of housing discrimination under the FHA or ADA based on a theory of disparate treatment, Plaintiffs must allege "(1) that they are members of a protected class; (2) that they sought and were qualified to rent . . . the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters."  *Id.* (internal quotation marks omitted); *see also Johnson v. Levy*, 812 F. Supp. 2d 167, 179 (E.D.N.Y. 2011) (same).  When analyzing the second prong of a prima facie case, "courts have used as a starting point the applicable criteria that the owner has established regarding who is 'qualified.'"  *Mancuso*, 808 F. Supp. 2d at 618.  In other words, to establish a prima facie case of discrimination for housing under the statutes, "the renter must satisfy the applicable criteria that the owner established."  *Johnson*, 812 F. Supp. 2d at 180 (internal quotation marks omitted); *see also Passanante v. R.Y. Mgmt. Co., Inc.*, No. 99-CV-9760, 2001 WL 123858, at *5 (S.D.N.Y. Feb. 13, 2001) (holding a plaintiff did not make out a prima facie case of discrimination where the plaintiff was not financially qualified to rent the apartment).

As to discrimination based on failure to offer a reasonable accommodation, because "[t]he relevant portions of the FHA, ADA, and Section 504 . . . offer the same guarantee that a covered entity, such as a public housing authority, must provide reasonable accommodations in

order to make the entity's benefits and programs accessible to people with disabilities[,] . . . analysis of a reasonable [accommodation] claim under the three statutes is treated the same." *Sinisgallo*, 865 F. Supp. 2d at 337 (alterations, citations, and internal quotation marks omitted); *see also Logan*, 2014 WL 5025953, at *16 (collecting cases); *accord Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 335 (2d Cir. 1995) (explaining that an FHA claim based on a failure to make a reasonable accommodation, is analyzed under the "standards for reasonable accommodations developed under [§] 504 [of the Rehabilitation Act of 1973]" (internal quotation marks omitted)).   "To make out a claim of discrimination based on a failure to accommodate, a plaintiff must allege that: (1) [s]he suffers from a handicap as defined by the FHA[] [or a disability as defined by the ADA and the Rehabilitation Act]; (2) the defendant knew or reasonably should have known of the plaintiff's handicap [or disability]; (3) accommodation of the handicap [or disability] may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) [the] defendant[] refused to make such accommodation." *Logan*, 2014 WL 5025953, at *18 (third, fourth, and fifth alterations in original) (internal quotation marks omitted).   "To prevail on a reasonable accommodation claim, plaintiffs must first provide the [covered] entity an opportunity to accommodate them through the entity's established procedures . . . ." *Tsombanidis*, 352 F. 3d at 578.

### 3.  New York Antidiscrimination Law

NYHRL § 296 makes it unlawful "[t]o refuse to . . . rent or lease or otherwise to deny to or withhold from any person . . . such housing accommodations because of the race, creed, color, disability, national origin, sexual orientation, military status, age, sex, marital status, or family status of such person . . . or to represent that any housing accommodation . . . is not available for inspection, . . . rental, or lease when in fact it is so available."  N.Y. Exec. Law § 296(2-a)(a).

14

"The elements of a claim under the NYHRL are the same as under the Fair Housing Act."
*Echeverria v. Krystie Manor, LP*, No. 07-CV-1369, 2009 WL 857629, at *8 (E.D.N.Y. Mar. 30, 2009); *see also Johnson*, 812 F. Supp. 2d at 179 (same).

### 4.  Retaliation Under The FHA and NYHRL

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604[.]"  42 U.S.C. § 3617.  Accordingly, the statute "safeguards members of the protected class from coercion, intimidation, threats, or interference in the exercise or enjoyment of their Fair Housing Rights . . . [and] it protects third parties, not necessarily members of the protected class, who aid or encourage protected class members in the exercise or enjoyment of their Fair Housing Act rights."  *Frazier v. Rominger*, 27 F.3d 828, 833 (2d Cir. 1994) (citations omitted).  "The elements of a prima facie retaliation claim under the FHA are (1) the plaintiff engaged in protected activity, (2) the defendant was aware of this activity, (3) the defendant took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action."  *Ponce v. 480 E. 21st St., LLC*, No. 12-CV-4828, 2013 WL 4543622, at *3 (E.D.N.Y. Aug. 28, 2013); *see also Cain v. Rambert*, No. 13-CV-5807, 2013 WL 6194294, at *3 (E.D.N.Y. Nov. 26, 2013) (same); *Mazzocchi Windsor v. Owners Corp.*, No. 11-CV-7913, 2013 WL 5295089, at *12 (S.D.N.Y. Sept. 17, 2013) (same).  Moreover, "the plaintiff is required to show that [the] defendants' action against him [or her] arose from a discriminatory motive."  *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 586 (S.D.N.Y. 2012).

Under New York Law, it is unlawful to "retaliate or discriminate against any person

because he or she has opposed practices[,]" including a refusal to "sell, rent, lease or otherwise

deny or withhold from any person . . . such a housing accommodation because of the race, creed,

color, national origin, sexual orientation, military status, sex, age, disability, marital status, or

familial status of such person[.]"  N.Y. Exec. Law §§ 296(5),(7)  The same standards that govern

retaliation under the FHA apply to retaliation claims under the NYHRL.  *See Broome v. Biondi*,

17 F. Supp. 2d 211, 218–219 (S.D.N.Y. 1997) (listing elements of a prima facie case of

retaliation under the FHA and NYHRL); *cf. Richardson v. City of New York*, 285 F. Supp. 2d

303, 305 (E.D.N.Y. 2003) ("New York courts have adopted the federal standards for retaliation

claims.)

### B.  Analysis

#### 1.  Housing Discrimination Claims

The Court construes Plaintiffs' first and second causes of action, as well as other

allegations made throughout the Second Amended Complaint, as claims that Defendants violated

the FHA, ADA, Section 504, and NYHRL by failing to provide Ettawanda Wilson with

reasonable accommodations.  Specifically, Plaintiffs claim that Defendants did not accommodate

Ettawanda Wilson by permitting her to rent a two-bedroom apartment, and, relatedly, by

installing carpet in the two-bedroom unit that she wanted to rent.  (SAC at 1, 4.)  The Court

construes the third cause of action, as well as other allegations made throughout the Complaint,

as claims that Defendants discriminated against Plaintiffs on the basis of their race, in violation

of the FHA and NYHRL by failing to allow Plaintiffs to rent the two-bedroom unit.

Defendants argue that Plaintiffs cannot survive a motion to dismiss under any of the

applicable federal and state statutes, because Plaintiffs fail to allege facts "from which the Court

could infer satisfaction of the required conditions for a two-bedroom apartment."  (Defs.' Mem.

of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") 5 (Dkt. No. 32).)  The Court agrees.

"[C]ommon to all housing discrimination claims under the FHA, NYHRL, ADA, and the Rehabilitation Act is the requirement that . . . 'plaintiff[s] show that [they were] qualified for an available benefit and w[ere] denied that benefit.'" *Johnson*, 812 F. Supp. 2d at 180 (quoting *Passanante*, 2001 WL 123858, at *5).  Moreover, "to survive a motion to dismiss the plaintiff[s] must plead more than the conclusory assertion that they met the stated requirements and therefore were qualified to rent or purchase the housing." *Id.* at 181 (internal quotation marks omitted).  Instead, the "plaintiff[s] must allege facts from which the court can infer that they satisfied any necessary preconditions." *Id.* (internal quotation marks omitted); *see also Tsombanidis*, 352 F. 3d at 578 ("To prevail on a reasonable accommodation claim, plaintiffs must first provide the [covered] entity an opportunity to accommodate them through the entity's established procedures[.]"); *Passanante*, 2001 WL 123858, at *5 ("The Fair Housing Act, the Rehabilitation Act, and the ADA each require that a plaintiff show that he [or she] was qualified for an available benefit and was denied that benefit.").

Here, not only do Plaintiffs fail to "allege facts from which the court can infer that they satisfied [the] necessary preconditions" to qualify for a two-bedroom apartment, *Johnson*, 812 F. Supp. 2d at 181 (alteration and internal quotation marks omitted), but Plaintiffs' Second Amended Complaint and the exhibits appended to it, which the Court may consider on a motion to dismiss, *see Leonard F.*, 199 F.3d at 107, confirm that Plaintiffs did not take the steps necessary to apply for the benefit that they seek.[2]  In a letter dated January 26, 2013, Valerie

---

[2]  In addition to the fact that the exhibits are appended to the Second Amended Complaint, the Second Amended Complaint incorporates the relevant exhibits by reference.  "To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents . . . [and] [t]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the

Wilson informed Peagler that Ettawanda Wilson "is in dire need of a two[-]bedroom [apartment,] for which her name is at this time the present and next in line." (SAC Ex. 1, at unnumbered 1 (internal quotation marks omitted); *see also* SAC ¶ 7.) Valerie Wilson also sent an inquiry dated February 1, 2013 to O'Neill, stating, among other things, that Peagler was "ignoring reasonable accommodation request[s] for a two[-]bedroom apartment that has been put forth [on] two separate verbal occasions and with former management." (SAC Ex. 7, at unnumbered 1 (internal quotation marks omitted); *see also* SAC ¶¶ 82, 86.)

Peagler addressed Valerie Wilson's request, however, in a letter to Ettawanda Wilson, dated February 5, 2013. (SAC Ex. 10; *see also* SAC ¶ 96.) In the letter, Peagler informed Ettawanda Wilson "that based on [her] last recertification, [Ettawanda Wilson] currently [is] a household of one person[,] and [i]n order for Valerie to reside in [the] apartment as [her] primary residence, [Ettawanda Wilson] may either request that [Valerie Wilson] be added to the household (in which case [management] must include her income and assets to the household) or provide documentation satisfactory to HUD to qualify [Valerie Wilson] as a live-in aide." (SAC Ex. 10, at unnumbered 1.) Peagler then provided the "regulations for the HUD Section 8 program . . . [concerning] the eligibility requirements for a live-in aide who is also a relative of a tenant." (*Id.*) The regulations require, among other things, that "[t]he housing company . . . verify that the tenant requires the support of a live-in aide because of a disability-related need[,]" and "[t]he live-in aide must undergo[] screening for drug activity, credit and criminal activity, and the screening process should be the one the owner has

---

complaint." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (alteration and internal quotation marks omitted). Here, as Plaintiffs attached the exhibits to the Second Amended Complaint, there is no doubt that they had actual notice of the information therein. Moreover, as detailed above, Plaintiffs rely on and/or extensively quote the documents in framing the Second Amended Complaint. Accordingly, the Court considers the exhibits in evaluating the instant Motion.

established for new applicants and additions to households." (*Id.*)  Accordingly, Peagler explained, that in order to consider the request for a two-bedroom apartment, management "must verify that [Ettawanda Wilson's] need for a live-in aide is a disability-related need." (*Id.*) Moreover, Peagler indicated that management "must also receive adequate written verification from [Ettawanda Wilson's] physician or other health-care provider that [she has] a disability related need for a live-in aide." (*Id.*)  Peagler explained that "[t]he letter [she] received from [Ettawanda Wilson's] physician—Dr. Atler—states that [Ettawanda Wilson] need[ed] a two-bedroom apartment for adequate space and privacy [and] unfortunately these reasons do not meet the HUD requirements." (*Id.*)  Peagler also stated that if Valerie Wilson was living in the apartment, Ettawanda Wilson failed to report the "addition of a household member to [m]anagement[,] . . . in violation of HUD Section 8 regulations and [Ettawanda Wilson's] lease agreement." (*Id.*).  Peagler's letter also requested that Ettawanda Wilson share the information with her daughter, and indicated that "[s]hould Valerie have Power of Attorney that authorizes her to handle matters related to [Ettawanda Wilson's] tenancy," to forward her mailing address and contact information, so that the management could respond to Valerie Wilson directly.  (*Id.* at unnumbered 2.)

In an e-mail sent on February 21, 2013, O'Neill acknowledged that HUD received two inquiries from Valerie Wilson.  (SAC Ex. 9, at unnumbered 1; *see also* SAC ¶ 91.)  O'Neill explained that HUD "contacted a representative of the management agent . . . regarding the matter[,]" and that "[t]hey informed [HUD] that they . . . responded to [Ettawanda Wilson], the official tenant for the unit, in writing, outlining the steps required to have [Valerie Wilson] added to the lease as an additional tenant or as a live-in aide." (SAC Ex. 9, at unnumbered 1.)  O'Neill explained that the management is "not objecting to [the] requests, but they are obligated to abide

by HUD regulations" and "[t]he letter [from Peagler] outlines in detail what is required . . . to comply with them."  (*Id.*; *see also* SAC ¶ 93.)

Moreover, Plaintiffs do not claim that they followed the necessary procedures to apply for the two-bedroom apartment.  Instead, the allegations in the Second Amended Complaint confirm that Plaintiffs did not attempt to add Valerie Wilson to the household or qualify her as a live-in aide, as Peagler's letter and O'Neill's email explained was necessary to comply with HUD regulations and thus qualify for the benefit that Plaintiffs seek.  Specifically, after Plaintiffs received O'Neill's email response, Plaintiffs state that they "were both in full agreement . . . that [they] were completely done with the matter."  (SAC ¶ 94 (emphasis added).)  Indeed, Plaintiffs admit that Valerie Wilson has "not requested to be a tenant on [her] mother['s] lease[,]" (*id.* ¶ 97), and that she does "not believe caretakers are required to be on the lease nor . . . [is there a requirement] to recertify because income from a live[-]in aid is excluded from the household['s] annual income[,]" (*id.* ¶ 98).  The Second Amended Complaint also states that Valerie Wilson "h[as] no problem . . . submitting to the screenings [required of a live-in aid] *as long as*" certain "evidence can be submitted to [the] court proving" various things about other individuals residing in the apartment.  (*Id.* at ¶ 98 (emphasis added).)

The exhibits appended to the Second Amended Complaint and the allegations therein leave insufficient room for the Court to "infer that [Plaintiffs] satisfied [the] necessary preconditions" to qualify for a two-bedroom apartment.  *Johnson*, 812 F. Supp. 2d at 181 (alteration and internal quotation marks omitted).  Rather, the allegations in the Second Amended Complaint make clear that Plaintiffs did not "first provide the [Defendants] an opportunity to accommodate them through the . . . established procedures," namely that they attempt to qualify Valerie Wilson as a live-in aide, or otherwise add her to the household.

*Tsombanidis*, 352 F.3d at 578.  Accordingly, Plaintiffs do not "satisfy the 'qualified' element for a prima facie housing discrimination claim," and they therefore cannot make out a claim for housing discrimination under the applicable statutes.  *Johnson*, 812 F. Supp. 2d at 180 (alteration and internal quotation marks omitted); *see also Passanante*, 2001 WL 123858, at *5 (holding that the plaintiff did not establish a prima facie violation of the FHA, Rehabilitation Act, or ADA because he was not "qualified" to rent an apartment without a Section 8 rent subsidy and he "ha[d] not been denied a benefit" because "only two apartments [had] become available, and neither [had] been a one-bedroom apartment for an applicant at [the plaintiff's] income level").  Moreover, as Plaintiffs never applied for the benefit that they seek, they cannot claim they were rejected for the housing opportunity, as required for a prima facie case of disparate treatment, *see Mancuso*, 808 F. Supp. 2d at 617, or that Defendants refused to reasonably accommodate Ettawanda Wilson, as required for a prima facie case of failure to make a reasonable accommodation, *see Logan*, 2014 WL 5025953, at *18.  In sum, Plaintiffs must first apply for the benefit that they seek before a prima facie case of discrimination may be pled.  Accordingly, Plaintiffs' first, second, and third causes of action must be dismissed for failure to state a claim under the applicable federal and state anti-discrimination statutes.

### 2.  Retaliation Claims

The Court construes Plaintiffs' fourth and fifth causes of action as claims that Defendants retaliated against them in violation of the FHA and NYHRL.  (SAC at 8, 16.)  As an initial matter, it is worth noting that "[e]ven when a plaintiff's underlying discrimination claim is dismissed, her retaliation claim may survive if she 'had a good faith, reasonable belief' that she was opposing the unlawful practice."  *Ponce*, 2013 WL 4543622, at *3 n.4 (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)).  The

Court, therefore, considers Plaintiffs' retaliation claims even though Plaintiffs fail to state plausible claims of discrimination.

As discussed above, "[u]nder the [FHA] and the [NYHRL], [a plaintiff is] required to make a prima facie case of retaliation by showing that (1) she engaged in protected activity by opposing conduct prohibited under each of these laws, (2) the . . . defendants were aware of that activity, (3) she was subject to an adverse action, and (4) there was a causal connection between the protected activity and the adverse action." *Broome*, 17 F. Supp. 2d at 218–19; *see also Ponce*, 2013 WL 4543622, at *3 ("[T]he elements of a prima facie retaliation claim under the FHA are (1) the plaintiff engaged in protected activity, (2) the defendant was aware of that activity, (3) the defendant took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action.").

In the fourth cause of action, Plaintiffs claim that Defendants retaliated against them by "serving" and sending various letters to Ettawanda Wilson about recertification, the unit inspection, and painting requirements, as described in detail above. To begin, it is unclear what protected activities Plaintiffs allege to have engaged in to state a claim of retaliation under 42 U.S.C. § 3617 or the NYHRL to satisfy the first prong of retaliation under the statutes. Nevertheless, the Court construes the allegations in the fourth cause of action to suggest that Defendants retaliated against Plaintiffs because (1) they protested perceived racial or disability discrimination against them, and/or (2) they requested a reasonable accommodation, specifically that Plaintiffs be allowed to live in a two-bedroom apartment.

"Protected activity under the FHA refers to 'action taken to protest or oppose statutorily prohibited discrimination.'" *Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Cond. II*, 457 F. Supp. 2d 126, 131 (E.D.N.Y. 2006) (quoting *Cruz v. Coach Stores, Inc.*, 202

F.3d 560, 566 (2d Cir. 2000)).  Such action includes the "[f]iling [of] complaints . . . and even

less formal means of protest such as letter writing, . . . *if* it is lodged in protest of statutorily

prohibited discrimination."  *Kendrick v. Greenburgh Hous. Auth.*, No. 07-CV-5859, 2011 WL

1118664, at *9 (S.D.N.Y. Mar. 22, 2011).  Moreover, to plausibly state a claim of retaliation,

Plaintiffs must allege facts to support that they "took action to affirmatively oppose

discrimination against [them] by [Defendants]."  *Broome*, 17 F. Supp. 2d at 219.  Here, the

allegedly adverse actions that Plaintiffs point to—that Defendants sent Ettawanda Wilson notices

regarding recertification and painting requirements and that, when Ettawanda Wilson failed to

respond to the requests for a paint job, Defendants sent her a letter scheduling a unit

inspection—predate any activities Plaintiffs allege that they engaged in to protest or oppose

discrimination.  Specifically, the letters that Plaintiffs complain of were sent on March 12, 2012,

March 27, 2012, April 6, 2012, and April 23, 2012.  (SAC Ex. 4, at unnumbered 1–4.)  The first

indication in the Second Amended Complaint that Plaintiffs "protest[ed] or oppose[d] statutorily

prohibited discrimination," *Miller*, 457 F. Supp. at 131, is the letter dated April 24, 2012, which

Clark references in her letter dated May 1, 2012.  (*Id.* at unnumbered 5.)  The other letters, visits,

and complaints of discrimination to Peagler and O'Neill to which Plaintiffs refer were dated or

occurred in 2013.  Although Plaintiffs allege that Defendants were aware in 2012 that Valerie

Wilson was living with Ettawanda Wilson, (SAC ¶ 105), Plaintiffs do not state that they "took

action to affirmatively oppose discrimination against [them] by [Defendants]," *Broome*, 17 F.

Supp. 2d at 219, before the alleged retaliation occurred in 2012, like filing a complaint or

threatening to take legal action.  *Cf. Ponce*, 2013 WL 4543622, at *3 (concluding that the

plaintiff pled a prima facie case of retaliation in part because "[s]he engaged in protected activity

by filing a complaint against [the defendant]"); *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418,

432 (S.D.N.Y. 2005) ("Clearly, the filing of [the] plaintiffs' HUD complaint is a protected activity[.]").  Moreover, even though "[a] request for a reasonable accommodation is [a] protected activity" under the FHA, *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2013 WL 1211496, at \*10 n.14 (E.D.N.Y. Mar. 25, 2013) (citing *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002)), here there is no indication that Plaintiffs requested a reasonable accommodation—specifically the two-bedroom apartment—prior to receiving the March and April 2012 letters.  *Cf. Petrillo v. Schultz Props., Inc.*, No. 11-CV-6483, 2011 WL 4899963, at \*3 (W.D.N.Y. Oct. 13, 2011) (finding that the plaintiff's "allegation that she complained of [the] defendants' alleged failure to accommodate her needs constitutes protected activity under the FHA and, therefore, . . . [the] plaintiff ha[d] satisfactorily alleged that she engaged in a protected activity").  In short, at the time Plaintiffs received the letters of which they complain, they do not allege that they had engaged in protected activity by protesting or opposing discrimination, or by requesting a reasonable accommodation, for the purposes of a retaliation claim.  Accordingly, Plaintiffs fail to "allege that they were retaliated against for engaging in a protected activity as required under § 3617" or state law. *Miller*, 457 F. Supp. 2d at 131.  *See Mazzocchi*, 2013 WL 5295089, at \*12 ("Because the amended complaint fails to show that [the plaintiff] was protesting or opposing discrimination prohibited under the FHA, or that [the defendants] were aware that [the plaintiff] was complaining about discrimination, the retaliation claims are dismissed." (citation omitted)).  Put simply, "[w]here the adverse action *precedes* the [p]laintiff's complaints, [the] [p]laintiff cannot meet the subsequent-adverse-action or causal-connection prongs of his [or her] *prima facie* case." *Kendrick*, 2011 WL 1118664, at \*10.

Even assuming, arguendo, that Plaintiffs were engaged in a protected activity, there is

nothing in the Second Amended Complaint to suggest that the letters regarding the status of

Plaintiffs' recertification, painting, and unit inspection requirements constitute adverse actions

within the meaning of the FHA.  "To be actionable, an adverse action must have some materially

adverse effect on the plaintiff."  *Cain v. Rambert*, No. 13-CV-5807, 2014 WL 2440596, at *6

(E.D.N.Y. May 30, 2014) (internal quotation marks omitted).  Plaintiffs do not, however, state

how the letters adversely affected them.  *See Marks v. BLDG Mgmt. Co., Inc.*, No. 99-CV-5733,

2002 WL 764473, at *13 (S.D.N.Y. Apr. 26, 2002) (noting that the "basic principle—that in

order for an alleged adverse action to constitute unlawful retaliation, the action must have some

materially adverse effect on the plaintiff—has been affirmed by numerous courts in a variety of

contexts" and collecting cases).  "Moreover, the record does not show, or even suggest, that the

[letters] had any chilling effect on [Plaintiffs'] willingness to assert [their] rights under the

FHA."  *Id.*  Indeed, after Ettawanda Wilson received the letters, Valerie Wilson spoke with

O'Neill about her concerns with disability and/or racial discrimination and requested a

two-bedroom apartment from Peagler.  *See id.* at *13–14 (holding that the plaintiff failed to show

"injurious action" to establish retaliation because the plaintiff "neither suffered actual

interference with her use and enjoyment of her apartment, nor was she actually chilled in the

exercise of her rights under the [FHA]" (internal quotation marks omitted)).  Accordingly,

Plaintiffs' fourth cause of action is dismissed without prejudice for failure to state a claim.

      In their fifth cause of action, Plaintiffs allege that after they filed a complaint against

Defendants in 2011 for failure to exterminate for bed bugs, Gonzalez entered Plaintiffs'

apartment on at least two occasions to exterminate the apartment for bed bugs, without giving

Plaintiffs notice.  (SAC ¶¶ 113, 119–24.)  Plaintiffs cannot, however, make out a claim of

retaliation based on their complaint of bed bugs, as it is not "protected activity" within the

meaning of the housing discrimination statutes.  *See Miller v. 270 Empire Realty LLC*, No. 09-CV-2857, 2012 WL 1933798, at *5 n.9 (E.D.N.Y. Apr. 6, 2012) ("Filing a complaint with [New York City's Housing Preservation Department] that is not related to unlawful discrimination is not protected activity within the meaning of the FHA or analogous State and City laws."); *Williams v. N.Y.C. Hous. Auth.*, No. 07-CV-7587, 2009 WL 804137, at *8 (S.D.N.Y. Mar. 26, 2009) (holding that complaints about "general conditions" at a housing complex "were not protected activities for the purposes of establishing a retaliation claim in connection with allegations of disability discrimination" (internal quotation marks omitted)); *cf. United States v. Weisz*, 914 F. Supp. 1050, 1054 (S.D.N.Y. 1996) ("[T]o bring a claim within § 3617 [of the FHA], a plaintiff must allege conduct on the part of a defendant which in some way or other implicates the concerns expressed by Congress in the FHA.  If it were otherwise, the FHA would federalize any dispute involving residences and people who live in them."). Accordingly, Plaintiffs have failed to state a plausible claim of retaliation under the FHA or NYHRL and their fifth cause of action is dismissed without prejudice.

Plaintiffs' sixth cause of action, which lists the applicable housing discrimination statutes and repeats many of the same allegations of the first five causes of action, is also dismissed without prejudice for failure to state a claim for the same reasons as described above.

### III.  Conclusion

In light of the foregoing analysis, the Court grants Defendants' Motion To Dismiss Plaintiffs' Second Amended Complaint without prejudice.  Plaintiffs are given 30 days to file a Third Amended Complaint.  Failure to do so may result in dismissal of this case.  The Clerk of

Court is respectfully requested to terminate the pending Motion.  (Dkt. No. 30.)

SO ORDERED.

DATED:      February **17**, 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE